[Cite as *State v. Hughes*, 2017-Ohio-8250.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.  27433 |
| | : | |
| v. | : | T.C. NO. 98-CR-1706 |
| | : | |
| THOMAS C. HUGHES | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the ___20th___ day of ___October___, 2017.

. . . . . . . . . .

HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

THOMAS C. HUGHES, Inmate #364638, Allen Oakwood Correctional Institution, P. O. Box 4501, Lima, Ohio 45802
        Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Thomas C. Hughes appeals from a judgment of the Montgomery County

Court of Common Pleas, which overruled his application for DNA testing.

**Factual and Procedural History**

{¶ 2} Hughes was convicted in 1998 of felonious assault, kidnapping, and three counts of rape, and was sentenced to an aggregate term of 48 years to life in prison. On direct appeal, we reversed the trial court's judgment and remanded for resentencing, because the court failed to make any findings of fact regarding the imposition of consecutive sentences; we rejected Hughes's arguments that there were other prejudicial errors in the trial court proceedings. *State v. Hughes*, 2d Dist. Montgomery No. 17482, 1999 WL 812345 (Sept. 17, 1999). In 1999, Hughes was resentenced to an aggregate term of 38 years to life, and he did not appeal. Nunc pro tunc termination entries were also filed on October 7, 2008, and April 29, 2015, and Hughes did not appeal from these judgments.

{¶ 3} The evidence in the case, as set forth in our 1999 opinion, was as follows:

On May 14, 1998, at about 6:00 a.m., [the victim] was found unconscious and severely beaten in a lot located at York and Second Streets in Dayton. Police found her bra, panties and driver's license on a porch at 33 York Street. [The victim] was taken to Grandview Hospital where she was treated, and a rape examination was conducted. When she regained consciousness, [the victim] informed the police that the attack had not taken place at York Street, but occurred "off of North Main Street."

After her release from the hospital two days later, [the victim] proceeded to search for the place of the attack. She then notified the police that she had been attacked at 46 Medina, the residence of Hughes.

Later, she identified Hughes from a photographic array as the perpetrator. She also described the interior of the residence. [The victim], an admitted prostitute, told the police that she came into contact with Hughes during the night of May 13 and accompanied him to his house in order to have sex. She stated that she needed to earn money to buy crack cocaine and that she had already had two "hits" of crack earlier in the evening. She also stated that when she asked Hughes for money he became violent and forced her to have vaginal, oral and anal intercourse. She also stated that she asked to go the bathroom, but instead went into the bedroom of one of his children to try to awaken someone. The bedroom was empty. [The victim] stated that Hughes then became violent and hit her, knocking her down the stairs and causing her to hit her head on the stairway wall. She stated that she had no memory of what happened after that until she woke up in the hospital.

A search warrant was secured for the premises. During the search, the police photographed stains that they believed to be blood in the bedroom and on the stairwell of the residence. The police also found a Minnie Mouse watch, which [the victim] claimed was hers. Hughes was arrested. After initially denying any contact with [the victim], Hughes told the police that he had picked her up on East Third Street and that he took her to his residence for sex. However, he claims that this occurred on May 12. According to Hughes, [the victim] was performing oral sex upon him when he caught her trying to steal his wallet. He claims that he slapped

her, ended the "sex date," and took her back to East Third Street.

*Id.* at * 1-2.

{¶ 4} Additionally, blood found on a comforter in Hughes's house "could not be directly linked to a specific person," but a forensic scientist testified that it was of the same type as both Hughes and the victim. *Id.* at * 5. Some blood samples from the bedroom and stairwell were determined to be human, but the samples were too small to determine their blood type; tests on other blood and saliva samples were inconclusive, neither specifically excluding nor including Hughes. *Id.* at 7-8. Hughes presented alibi evidence that he had made two phone calls during the timeframe that the victim claimed to have been at his house. Hughes was convicted and sentenced as described above.

{¶ 5} On October 20, 2016, Hughes filed an Application for DNA Testing pursuant to R.C. 2953.71 et seq. The State filed a memorandum contra on Friday, December 9, 2016, which set forth its substantive arguments. On Monday, December 12, the State filed a motion to extend its time for the filing of an inventory report pursuant to R.C. 2953.75 until January 13, 2017, and to postpone any decision on Hughes's application until the inventory report was submitted. On December 16, 2016, Hughes filed a "Notice of Intent to File a Reply" with the court, which stated that he intended to file a response to the State's memorandum contra, but that, due to limited access to the law library computers in prison, his reply would be filed by February 15, 2017.

{¶ 6} The State filed its inventory on January 4, 2017, at which time Hughes had not yet filed his reply. The trial court denied Hughes's application for DNA testing on January 6, 2017.

***Denial of Application without Waiting for Hughes's Reply***

{¶ 7} In his first assignment of error, Hughes argues that the trial court erred in denying his application without waiting for his reply, because the State's memorandum contra had been untimely, he had informed the court of his intention to file a reply, and logistical issues at the prison library had prevented him from filing a timely reply. The State responds that Hughes did not raise the issue of the timeliness of the State's memorandum contra in the trial court, that Hughes had sufficient time (28 days) to file a reply, and that the trial court was not required to wait for his untimely reply before ruling on the application.

{¶ 8} Hughes argues that the State was required to file its response to his application within 14 days, pursuant to Loc.R. 2.05(B)(2)(b) of the Montgomery County Court of Common Pleas. However, R.C. 2953.73(C) provides that the State's response to an application for DNA testing "shall be filed not later than forty-five days after the date on which the eligible offender submits the application." Because this rule specifically relates to applications for DNA testing, and because statutory provisions prevail over local rules of court, the local rule did not apply. *See State ex rel. Glass v. Reid*, 62 Ohio App.3d 328, 331, 575 N.E.2d 516 (2d Dist.1991).

{¶ 9} Even under the statutory provision, the State's response was untimely by a few days. The State explained in its request for an extension to file the inventory that the attorney originally handling the case had left on medical leave, causing the case to be reassigned. The trial court acted within its discretion in accepting this explanation and considering the memorandum contra.

{¶ 10} Hughes also relies on Loc.R. 2.05(B)(1)(b) of the Montgomery County Court of Common Pleas in support of his argument that he was permitted to file a reply

to the State's memorandum contra. We agree that Hughes was permitted to file a reply. *See State v. Nalls*, 164 Ohio App.3d 567, 2005-Ohio-6260, 843 N.E.2d 232 (2d Dist.). However, the rule provides that such a reply may be filed within seven days from the filing of the memorandum in opposition. Instead, within the seven-day period, Hughes filed a "Notice of Intent to File a Reply," informing the court that his reply would be filed two months later due to limited access to the law library research computers.

{¶ 11} Hughes has cited no authority for his implicit argument that he was permitted to extend the deadline for filing a reply simply by filing a notice of his intent to file one. The trial court was not required to wait for his reply to be filed on a date of his choosing, long after the timeframe set forth in the rule, and without leave of court. Moreover, Hughes has not made any argument suggesting how he was prejudiced by his inability to file a reply.

{¶ 12} Hughes's argument that the trial court erred in failing to wait for his reply is without merit, and his first assignment of error is overruled.

### *Denial of Application for DNA Testing*

{¶ 13} In his second assignment of error, Hughes argues that the trial court erred in concluding that DNA testing would not be outcome determinative in his case and in denying his application on that basis.

{¶ 14} Since 2003, Ohio law has provided specific procedures for postconviction DNA testing. *See* Am.Sub.S.B. No. 11; Am.Sub.S.B. No. 262; Am.Sub.S.B. No. 77; *see also* former and current R.C. 2953.71 through R.C. 2953.83. Recent statutory enactments which allow for the possibility of postconviction DNA testing recognize that DNA testing technologies have advanced very rapidly, and that changes in the testing

procedures have produced more accurate and/or sophisticated results than were previously possible. Courts have also recognized this fact, noting "the law's never-ending quest to ensure that no innocent person be convicted." *State v. Emerick,* 2d Dist. Montgomery No. 24215, 2011-Ohio-5543, ¶ 31, citing *State v. Ayers,* 185 Ohio App.3d 168, 2009-Ohio-6096, 923 N.E.2d 654, ¶ 24 (8th Dist.). *See also State v. Prade,* 126 Ohio St.3d 27, 2010-Ohio-1842, 930 N.E.2d 287, ¶ 20.

{¶ 15} In an effort to address these advances, the Ohio legislature established "a mechanism and procedures for the DNA testing of certain inmates" in 2003; the statutory scheme was amended in 2004, 2006, and 2010. *Emerick* at ¶ 23. R.C. 2953.72(C)(1) establishes the criteria for preliminary eligibility for postconviction DNA testing, and R.C. 2953.74 outlines additional factors that must be satisfied before a trial court "may accept an application" for DNA testing. *See* R.C. 2953.74(B) and (C). The trial court found that Hughes was an "eligible offender," and this determination is not at issue in this appeal.

{¶ 16} Pursuant to R.C. 2953.74(B)(1), where an eligible offender submits an application for DNA testing and the offender did not have a DNA test taken at the trial stage in the case in which the offender was convicted, the court may accept the application for DNA testing only if the offender "shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case * * * would have been outcome determinative at that trial stage in that case, and, at the time of the trial stage in that case, DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available." R.C. 2953.74(B)(1).

{¶ 17} The Stated conceded, and the trial court found, that DNA testing was

generally not yet available at the time of Hughes's trial.

{¶ 18} "Outcome determinative" means that, "had the results of DNA testing of the subject offender been presented at the trial of the subject offender requesting DNA testing and been found relevant and admissible" with respect to the offense for which the offender was convicted and is requesting the DNA testing, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case, "there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense." R.C. 2953.71(L).

{¶ 19} The trial court "has discretion on a case-by-case basis" to accept or reject an eligible inmate's application for DNA testing. R.C. 2953.74(A). We therefore review the trial court's denial of a motion for further DNA testing for an abuse of discretion. An abuse of discretion implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. *Emerick,* 2d Dist. Montgomery No. 24215, 2011-Ohio-5543, ¶ 24, citing *State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 130.

{¶ 20} Here, the trial court found that the identity of the perpetrator had not been in question based on the evidence presented at Hughes's trial. The victim positively identified Hughes from a photo array and at trial, and identified the vehicle he used to drive her to his residence. The victim also described to the police specific locations in Hughes's house where her blood would be found and, after the execution of a search warrant, blood was found in those locations. The victim also described a Minnie Mouse watch which Hughes had told her to remove during the offenses, and that watch was later discovered in Hughes's bedroom. Hughes admitted to having brought the victim to his home for sex, but he disputed to exact timeframe, claiming that their encounter had been

a day earlier than what the victim asserted. Based on phosphoglucomutase testing that was conducted on a vaginal swab prior to trial, Hughes was not excluded as a potential source.

{¶ 21} In denying the application, the trial court noted that Hughes admitted to picking up the victim on East Third Street and bringing her to his residence for consensual sex. He also admitted that the victim had performed fellatio, but that he had slapped her and ended the "sex date" when he believed she was trying to take his wallet, and then he drove her back to East Third Street. The trial court concluded that DNA testing would not be outcome determinative because Hughes admitted having sexual activity with the victim and because of "other evidence established at trial."

{¶ 22} In support of the trial court's finding, the State cites *State v. Constant*, 11th Dist. Lake No. 2008-L-100, 2009-Ohio-3936, a case in which a store clerk was robbed, kidnapped, and raped. In finding that DNA testing would not be outcome determinative, the court noted that "there was powerful testimony from the victim" at trial identifying the defendant as her attacker, including her observation of his features and clothing, a brief conversation with the defendant, her observations of him in the store for about five to ten minutes, and her testimony that he had been in the store on other occasions prior to her attack. The court held that "[t]he victim testimony alone negates any strong probability that the jury would not have found Constant guilty."

{¶ 23} The judgment in *Constant* also relied on *State v. Roberts,* 5th Dist. Guernsey No. 2006-CA-02, 2006-Ohio-5018, which involved a robbery and stabbing death. In that case, in addition to finding that the defendant had not established that enough biological material could be extracted for sampling, the court found that DNA

testing would not be outcome determinative because, "[e]ven if DNA testing excluded the appellant as the source of the hair in the hands of the victim or the fingerprint found in the home[,] a reasonable jury could still find appellant guilty of the charges set forth in the indictment" based on circumstantial evidence and testimony of the other witnesses. *Id.* at ¶ 56 (citation omitted).

**{¶ 24}** *See also State v. Sells*, 2d Dist. Miami No. 2016-CA-15, 2017-Ohio-987 (even if DNA testing of the murder weapon and the victim's pants established the presence of someone else's DNA, such a result would not be outcome determinative with regard to defendant's guilt; such evidence would establish only that someone else had touched the bat and had contact with the victim, but it would not exclude the defendant as the perpetrator or negate the overwhelming evidence of the defendant's own involvement in the crime); *State v. Nalls,* 2d Dist. Montgomery No. 21558, 2007-Ohio-1676, ¶ 30 (where the State did not rely on DNA evidence in convicting the defendant, confirmation of the absence of his DNA through postconviction DNA testing "would only demonstrate what the trial court was aware of at trial" and would not be outcome determinative); *State v. Nelson*, 8th Dist. Cuyahoga No. 85930, 2005-Ohio-5969 (where defendant was identified as a rape assailant by more than one witness, including the victim and the co-defendant, absence of defendant's DNA on the victim's clothing would not be "outcome determinative").

**{¶ 25}** The victim testified that she had been raped and beaten by Hughes. She also identified his house – where the offense happened – and provided a detailed description of the inside of the house to the police. Blood was located in Hughes's house, where the victim told the police that her blood might be (a bedroom and stairwell).

The trial court did not abuse its discretion in concluding that additional evidence about the source of this blood (*i.e.,* that it was Hughes's or belonged to a third person) would not have created a strong probability that no reasonable factfinder would have convicted Hughes based on the victim's testimony.

**{¶ 26}** Although the petition for postconviction relief attached an inventory from the Miami Valley Regional Crime Lab listing everything it tested in relation to the case, Hughes's petition only references DNA on "the blood evidence." The trial court did not abuse its discretion in concluding that evidence that the victim, an admitted prostitute, had someone else's saliva or other DNA on her body, as Hughes may be suggesting in his brief, likewise would not have created a strong probability that no reasonable factfinder would have convicted Hughes. Based on all of the evidence presented at trial, we cannot conclude that the trial court abused its discretion in finding that DNA testing would not be outcome determinative.

**{¶ 27}** The second assignment of error is overruled.

**{¶ 28}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies mailed to:

Heather N. Jans
Thomas C. Hughes
Hon. Dennis J. Adkins